UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

VIRGEN CEDENO, on behalf of herself
and all others similarly situated,

06 Civ. 6438 (JGK)

        Plaintiff,

OPINION AND

    - against -

ORDER

INDYMAC BANCORP, INC., and the
FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for INDYMAC
BANK, F.S.B.,

        Defendants.

─────────────────────────────────

JOHN G. KOELTL, District Judge:

This is a purported class action on behalf of the

plaintiff, Virgen Cedeno, and a similarly situated class of

residential home mortgage borrowers against defendant IndyMac

Bancorp, Inc. and the Federal Deposit Insurance Corporation, as

Receiver for IndyMac Bank, F.S.B. ("IndyMac"),[1] for alleged

violations of two federal statutes, namely the Real Estate

Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq.,

─────────────────────

[1] On July 11, 2008, the Office of Thrift Supervision closed IndyMac
Bank, F.S.B., and duly appointed the Federal Deposit Insurance Corporation as
Receiver. On August 21, 2008, this Court entered an Order substituting the
Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B.,
for defendant IndyMac Bank, F.S.B.

    On July 31, 2008, defendant IndyMac Bancorp, Inc. filed a voluntary
petition under Chapter 7 of Title 11 of the United States Code (the
"Bankruptcy Code") with the United States Bankruptcy Court for the Central
District of California. Therefore, this action is stayed against IndyMac
Bancorp, Inc. pursuant to 11 U.S.C. § 362(a)(1).

    While both defendants had originally filed the motion to dismiss, this
action is stayed as to IndyMac Bancorp, Inc. All references in this Opinion
referring to "IndyMac" refer to IndyMac Bank, F.S.B., for whom the Federal
Deposit Insurance Corporation, as Receiver, has been substituted as the
successor and real party in interest.

and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq.

The plaintiff also alleges four state law claims, namely alleged

violations of the California Business & Professions Code § 17200

et seq., and the New York General Business Law § 349; and claims

for breach of contract and unjust enrichment.[2]  The Amended

Complaint alleges that IndyMac failed to disclose to the

plaintiff that it selected appraisers, appraisal companies

and/or appraisal management firms who performed faulty and

defective appraisal services which inflated the value of

residential properties in order to allow the defendant to

complete more real estate transactions and obtain greater

profits.[3]  The inflated appraisals allegedly misled the plaintiff

as to the true equity in her home. IndyMac moves to dismiss all

claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.

---

[2] Jurisdiction over the state law claims is based on diversity of
citizenship jurisdiction pursuant to 28 U.S.C. § 1332.  The plaintiff is a
citizen of New York.  At the time this case was brought, IndyMac Bank, F.S.B.
was a citizen of California because it was headquartered there.  See 12
U.S.C. § 1464(x).  IndyMac Bancorp, Inc. is a Delaware corporation with its
principal place of business in California and is thus a citizen of both of
those states.  See 28 U.S.C. § 1332(c)(1).
    It should be noted that, in view of the presence of the Federal Deposit
Insurance Corporation as a party, there is now an independent basis for
jurisdiction under 12 U.S.C. § 1819(b)(2).
    [3] The defendants originally moved to dismiss the original complaint.  At
this Court's suggestion, the plaintiffs filed the Amended Complaint
attempting to respond to the arguments raised by the defendants.  The
defendants have now moved to dismiss the Amended Complaint.

**I.**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Twombly v. Bell Atlantic Corp., 127 S. Ct. 1955, 1974 (2007); see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). The Court may also rely upon documents on which the plaintiff relied in drafting the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

**II.**

The following facts alleged in the Amended Complaint are accepted as true for the purpose of deciding this motion to dismiss. IndyMac Bancorp is the holding company for IndyMac Bank, F.S.B., a federally chartered savings bank. (Am. Compl. ¶¶ 17, 18.)

The named plaintiff is a resident of Brooklyn, New York, who obtained an $80,000 line of credit from IndyMac Bank secured by her property located in Brooklyn. (Am. Compl. ¶ 16; Def.'s Ex. A.) In connection with the loan, the plaintiff was charged

a $500.00 appraisal fee.  The appraisal services on the
plaintiff's property were provided by an appraisal company known
as Supreme Appraisals.  (Am Compl. ¶ 26.)  The purported class
includes "all persons in the United States who, at any time from
January 1, 2004 to the present, have financed or refinanced
their mortgages and obtained an appraisal through IndyMac."
(Am. Compl. ¶ 50.)

The plaintiff alleges that IndyMac failed to provide the
necessary insulation and separation between its own internal
production or sales personnel responsible for providing the
mortgage services ("Production Personnel") and the credit or
valuation personnel who were responsible for overseeing and
verifying the accuracy of the appraisal services
("Credit/Valuation Personnel").  (Am. Compl. ¶¶ 2-4.)  This lack
of insulation allowed the Production Personnel to pressure the
Credit/Valuation Personnel to approve inflated appraisals so
that loans and profits could be increased.  IndyMac allegedly
failed to ensure that the appraisals were accurate and allowed
its own quality control staff to approve inflated and defective
appraisals.  (Am. Compl. ¶ 11.)

The Amended Complaint alleges that IndyMac communicated
that there was a certain "target value" or "qualifying value"
necessary to close the loan.  The appraisers understood that if
they met the targeted value, they would be selected for future

referral of business from IndyMac. Through direct and indirect communication, IndyMac informed the appraisers that the certain "target values" were desirable, and "low values" would impede the ability to close the loan. (Am. Compl. ¶ 43.) IndyMac hired appraisal management firms or appraisers whose prior performance repeatedly returned the values needed to match the qualifying loan values. (Am. Compl. ¶ 45.) Allegedly, according to a confidential witness, IndyMac refused to do further business with a certain appraisal management firm because that firm was not providing the needed value in appraisals to meet the targeted amount. (Am. Compl. ¶ 49.)

The Amended Complaint alleges that when consumers overpay for a home, or are induced to borrow excessively on the supposed equity of their homes, the results are inflated closing costs, higher interest, and in many cases the necessity of private mortgage insurance. (Am. Compl. ¶ 9.) Thus, the Amended Complaint alleges that the inflated appraisals which resulted from IndyMac's improper practices led the plaintiff and members of the purported class to pay higher closing costs and higher financing costs than they would have otherwise paid, and to pay more for their homes than warranted by the actual value of their homes. (Am. Compl. ¶¶ 5, 8-9.)

**III.**

Count Two of the Amended Complaint alleges a violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA"). Count Three of the Amended Complaint alleges a violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA").[4]

**A.**

Congress enacted RESPA "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). Congress also provided that a purpose of RESPA was "to effect certain changes in the settlement process for residential real estate that will result -- . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services . . . ." 12 U.S.C. § 2601(b).

---

[4] IndyMac asserts that the plaintiff has attempted to allege a violation of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. §§ 3331, et seq. ("FIRREA"), but that statute does not provide a private cause of action for the plaintiff's claims. The plaintiff did in fact allege in the Amended Complaint that "it is the very practices alleged herein that the federal government, in [1989], sought to regulate when it passed . . . [FIRREA]." (Am. Compl. ¶ 6.) However, the plaintiff has specifically disavowed any effort to bring a claim under FIRREA, and agrees that there is no private right of action under FIRREA for the appraisal standards promulgated under the statute. (Pl.'s Mem. at 5.) There is thus no FIRREA claim to be dismissed.

The plaintiff asserts a claim under 12 U.S.C. § 2607(a), RESPA's "anti-kickback" provision, which prohibits a person from giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). The term "thing of value" is broadly defined under the statute to include "any payment, advance, funds, loan, service, or other consideration." 12 U.S.C. § 2602(2). The statute also includes a "safe harbor" provision which provides: "Nothing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c).

The plaintiff alleges that IndyMac's manipulation of appraisers enabled it to receive higher appraisals, in return for which the appraisers received the opportunity to do further appraisals for IndyMac and for business referrals from IndyMac. Thus, the plaintiff alleges that the "thing of value" IndyMac received for referring business to appraisers was the inflated appraisals themselves, which allowed IndyMac to increase profits as a result of the mortgage loans. (Am. Compl. ¶¶ 70-71.) In

return, IndyMac allegedly referred business to the appraisers.
(Am. Compl. ¶¶ 70, 72.)

The defendant argues that the plaintiff fails to identify a
"thing of value" that the defendant received under RESPA, and
that in any event, the "safe harbor" provision of Section
2607(c)(2) precludes the plaintiff's claim, because Supreme
performed an appraisal for which it was paid, and RESPA is not
intended to serve as a price or quality control statute.

The plaintiff has failed to state a claim under RESPA.
Even assuming that IndyMac received a "thing of value" in the
form of inflated appraisals,[5] and that IndyMac promised and
provided business in return,[6] the plaintiff has not stated a

---

[5] "Thing of value" has been interpreted broadly to include various
benefits that an entity might receive in return for business referrals.  For
example, the Department of Housing and Urban Development has stated that
thing of value "is broadly defined" and:

> [I]ncludes, without limitation, monies, things, discounts, salaries,
> commissions, fees, duplicate payments of a charge, stock, dividends,
> distribution of partnership profits, franchise royalties, credits
> representing monies that may be paid at a future date, the opportunity
> to participate in a money-making program, retained or increased
> earnings, increased equity in a parent or subsidiary entity, special
> bank deposits or accounts, special or unusual banking terms, services
> of all types at special or free rates, sales or rentals at special
> prices or rates, lease or rental payments based in whole or in part on
> the amount of business referred, trips and payment of another person's
> expenses, or reduction in credit against an existing obligation.

24 C.F.R. § 3500.14(d).  See also Krupa v. Landsafe, Inc., 514 F.3d 1153,
1156 (11th Cir. 2008) (defining "thing of value" received by a mortgage
lender as the credit reporting agency's change in its pricing scheme, which
allowed the lender to pass along the costs of credit reports to its
customers).

[6] The defendant argues that the suggestion that inflated appraisals
benefit IndyMac is contrary to common sense, because inflated appraisals
result in under-secured loans, and under-secured loans lead to losses if the
borrower defaults.  However, this argument does not negate the plausibility
of the plaintiff's claim.  The plaintiff asserts that the higher appraisals
allowed the defendants to increase the money they would acquire as a result
of the mortgage loans.

claim under RESPA because the "safe harbor" provision of RESPA
applies.

The safe harbor provision provides that RESPA does not
prohibit payment for goods or facilities actually furnished or
services actually performed.  See 12 U.S.C. § 2607(c)(2).
Supreme received a $500 fee in return for an appraisal.  The
plaintiff concedes that she is not challenging the fee itself,
or that an appraisal was provided, but she challenged "IndyMac's
practices in relation to the appraisal services."  (Pl.'s Mem.
26.)  But RESPA is intended to protect consumers from
"unnecessarily high settlement charges caused by certain abusive
practices" in connection with mortgage transactions, 12 U.S.C. §
2601(a), and to eliminate "kickbacks or referral fees that tend
to increase unnecessarily the costs of certain settlement
services," 12 U.S.C. § 2601(b)(2).  It specifically does not
prohibit payments for services actually rendered.  12 U.S.C. §
2607(c)(2).

The plaintiff attempts to avoid the "safe harbor" provision
by arguing that the appraisal was "faulty and inaccurate."
(Pl.'s Mem. 27).  But there is no dispute that the appraisal was
performed and paid for.  The plaintiff attempts to modify the
plain meaning of the safe harbor by requiring an analysis of the
quality and price of the services actually performed.  That
interpretation exceeds the plain meaning of the statute and the

plaintiff cites no authority to support it.[7]  Because the safe

harbor provision of RESPA permits payment to a person for

services actually performed, the plaintiff has failed to state a

claim under RESPA.  See Gardner v. First Am. Title Ins. Co., 296

F. Supp. 2d 1011, 1019 (D. Minn. 2003) (holding that payments to

settlement services company for services actually performed fell

within safe harbor provision Section 2607(c)(2)); cf. DeLeon v.

Beneficial Constr. Co., 998 F. Supp. 859, 863-64 (N.D. Ill.

1998) (finding that the plaintiffs stated a claim under Section

2607 of RESPA where they alleged that no services were actually

performed or that services were only nominally performed).

**B.**

Similarly, the plaintiff's claim under TILA must fail.

TILA is a disclosure statute that requires that the terms of

credit and the fees charged for the extension of credit are

properly disclosed.  See 15 U.S.C. § 1637(a).  The purpose of

TILA is to assure "meaningful disclosure of credit terms to

---

[7] To the extent that the plaintiff's argument could be construed as
challenging the reasonableness of the payment, the plaintiff would read RESPA
as a "price control" statute.  In the course of interpreting RESPA's
prohibition against "splitting charges," 12 U.S.C. § 2607(b), the Court of
Appeals for the Second Circuit has held that RESPA was not intended to be a
price control statute.  See Kruse v. Wells Fargo Home Mortgage, Inc., 383
F.3d 49, 56-57 (2d Cir. 2004) (holding that rule in HUD Policy Statement,
which provided that a service provider could be liable under 12 U.S.C. §
2607(b) for charging a fee that exceeded the reasonable value of the goods or
services provided, was not entitled to deference because it was inconsistent
with the plain language of RESPA); accord Krzalic v. Republic Title Co., 314
F.3d 875, 881 (7th Cir. 2002) ("[RESPA] is not a price-control statute.");
Boulware v. Crossland Mortgage Corp., 291 F.3d 261, 268 (4th Cir. 2002)
("RESPA was meant to address certain practices, not enact broad price
controls.").

consumers." See Ford Motor Credit Co. v. Milhollin, 444 U.S.
555, 559 (1980) (citing 15 U.S.C. § 1601) (internal quotations
omitted).

The plaintiff claims that IndyMac "violated TILA by
demanding reimbursement for the costs to procure appraisal fees
in connection with the extension of credit when such costs are
related to the provision of improper and defective appraisal
services." (Am. Compl. ¶ 82.) The plaintiff does not contest
that the cost of the appraisal--$500--was accurately and
completely disclosed by IndyMac. Rather, the plaintiff alleges
that the appraisal was inflated. TILA is directed to requiring
that the cost of the service be set out, not to regulating the
quality of the service. See 15 U.S.C. § 1637a(4)(A) (requiring
the lender to provide certain disclosures at the time of opening
a Home Equity Line of Credit, including an "estimate . . . of
the aggregate amount of additional fees that may be imposed by
third parties (such as . . . appraisers . . .) in connection
with opening an account under the plan."); Szumny v. Am. Gen.
Fin., 246 F.3d 1065, 1070 (7th Cir. 2001)("TILA is a disclosure
statute; it does not regulate substantively consumer credit but
rather requires disclosure of certain terms and conditions of
credit before consummation of a consumer credit transaction.")
(internal quotation and citation omitted). The plaintiff has
failed to allege the specific provision of TILA that the

defendant violated and the plaintiff's allegations fail to state a claim under TILA.

**IV.**

The plaintiff also asserts a number of state law claims under New York and California law. Specifically, the plaintiff alleges claims for violation of the deceptive practices statutes in California and New York, namely the California Business & Professions Code § 17200 et seq. (Count Four), and the New York General Business Law § 349 (Count Six), as well as claims for breach of contract (Count One) and unjust enrichment (Count Seven).[8] IndyMac contents that these claims are preempted by the Home Owners' Loan Act, 12 U.S.C. § 1461 et seq. ("HOLA").

**A.**

"Preemption can generally occur in three ways: where Congress has expressly preempted state law, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or where federal law conflicts with state law." Clearing House Ass'n v. Cuomo, 510 F.3d 105, 113 (2d Cir. 2007) (quoting Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 313 (2d Cir. 2005)). Although there is generally a presumption against federal preemption of state law, see Clearing House, 510 F.3d at 113, the presumption against preemption "is not triggered . . . in an

_____

[8] There is no Count Five in the Amended Complaint.

12

area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108 (2000).

The Home Owners' Loan Act ("HOLA") provides that the Office of Thrift Supervision ("OTS") has principal responsibility for regulating federally chartered savings associations ("FSAs") such as IndyMac. 12 U.S.C. §§ 1462a, 1463(a), and 1464. In 12 C.F.R. § 560.2, the OTS states its intention to occupy the entire field of the lending regulation for FSAs:

> To enhance safety and soundness and to enable [FSAs] to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for [FSAs]. OTS intends to give [FSAs] maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation.

12 C.F.R. § 560.2(a). Pursuant to the plenary authority granted under HOLA to regulate the operations of FSAs, the OTS has promulgated extensive regulations governing the operations of FSAs. See Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 144-45 (1982) (discussing the authority of the Federal Home Loan Bank, the predecessor to the OTS).

An OTS regulation allows FSAs to "extend credit as authorized under federal law . . . without regard to state laws purporting to regulate or otherwise affect their credit activities." 12 C.F.R. § 560.2(a). In Paragraph (b) of 12 C.F.R. § 560.2, OTS provides illustrative examples of the types

of state laws preempted by OTS regulation, including state laws purporting to impose requirements regarding loan-related fees (§ 560.2(b)(5)), disclosure and advertising (§ 560.2(b)(9)), and processing or origination of mortgages (§ 560.2(b)(10)). Paragraph (c) of 12 C.F.R. § 560.2 identifies certain types of state laws, such as state contract, tort, and commercial law, that are not preempted to the extent "that they only incidentally affect the lending operations of [FSAs] . . . ." 12 C.F.R. § 560.2(c).

IndyMac argues that the plaintiff's state law claims are specifically directed at "loan-related fees" as contemplated by Section 560.2(b)(5) and directly challenge both IndyMac's "disclosure and advertising" and the "processing or origination of mortgages" as described in Sections 560.2(b)(9) and 560.2(b)(10). Thus, the defendant continues, the Court should not even reach the "incidental effect" analysis contained in section (c).

In a 1996 regulation, OTS provided guidance on the issue:

[T]he first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

61 Fed. Reg. 50951, 50966-50967 (Sept. 30, 1996).

When considering, as here, laws that do not on their face purport to impose regulations on the areas listed in paragraph (b), it is necessary to determine whether the law, as applied to the claims raised, is the type of law listed in paragraph (b).

For example, in Silvas v. E*Trade Mortgage Corp., 514 F.3d 1001 (9th Cir. 2008), the Court of Appeals for the Ninth Circuit held that the claims against a mortgage lender under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, and the California False Advertising Act, Cal. Bus. & Prof. Code § 17500, were preempted under HOLA. The plaintiffs claimed that the mortgage lender misrepresented that the lock-in fee was non-refundable, and they also claimed that the lock-in fee itself was unlawful. The Court of Appeals found that both claims were preempted. The first claim was preempted because the alleged misrepresentation was "contained in advertising and disclosure documents," and thus the alleged prohibition in state law was the type of state law contemplated in 12 C.F.R. § 560.2(b)(9) regarding advertising and disclosure documents. Id. at 1006. The alleged prohibition against the lock-in fee itself was preempted because it purported to impose requirements on loan-related fees which was preempted under 12 C.F.R. § 560.2(b)(5). Id. The Court of Appeals therefore found it

unnecessary to turn to an analysis under 12 C.F.R. § 560.2(c),
even though the claims related to a contract between the
borrower and the lender, because the California statute was the
type of law listed in 12 C.F.R. § 560.2(b).  Id. at 1006-07.

Similarly, in In re Ocwen Loan Servicing, LLC Mortgage
Servicing Litig., 491 F.3d 638 (7th Cir. 2007), the Court of
Appeals for the Seventh Circuit analyzed the difference between
sections (b) and (c) as follows:

> The line between subsections (b) and (c) is both intuitive
> and reasonably clear.  The Office of Thrift Supervision has
> exclusive authority to regulate the savings and loan
> industry in the sense of fixing fees (including penalties),
> setting licensing requirements, prescribing certain terms
> in mortgages, establishing requirements for disclosure of
> credit information to customers, and setting standards for
> processing and servicing mortgages.  But though it has some
> prosecutorial and adjudicatory powers ancillary to its
> regulatory functions, the Office has no power to adjudicate
> disputes between the S & Ls and their customers.

Id. at 643 (internal quotations and citations omitted).  The
Court's task, then, is to decide "which claims fall on the
regulatory side of the ledger and which, for want of a better
term, fall on the common law side."  Id. at 644.  The Court of
Appeals found that various claims were "pretty clearly, even
certainly, preempted," while others "probably are not," and that
the trial court should have required the plaintiffs to specify
the acts they contended violated state law.  Id. at 648.  See
also Rosenberg v. Washington Mut. Bank, FA, 849 A.2d 566, 572

(N.J. Super. Ct. App. Div. 2004) (finding claims under state contract statutes preempted under paragraph (b)).

The plaintiff argues that her state law claims challenging IndyMac's appraisal practices are state contract and commercial challenges that fall within the exceptions outlined in paragraph (c). IndyMac argues that the plaintiff is merely trying to circumvent HOLA preemption by pleading plainly preempted claims as violations of state contract law and consumer protection statutes. The question before the Court is whether the plaintiff's claims under state contract law and California and New York state deceptive practice statutes are brought in an effort to regulate IndyMac's appraisal practices in a way that interferes with an area defined in paragraph (b) or more than incidentally affects IndyMac's federally regulated thrift operations for purposes of paragraph (c).

**B.**

**1.**

The plaintiff alleges that the defendant engaged in unlawful, unfair or fraudulent business acts and/or practices within the meaning of the California Unfair Competition Law ("UCL"), § 17200 of the California Business & Professions Code. The California UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [§ 17500],"

17

which prohibits false advertising. Cal. Bus. & Prof. Code §
17200. Specifically, the plaintiff alleges that the defendant
(i) misrepresented the terms of its contracts, (ii) manipulated
appraisals in breach of its contracts, (iii) concealed the true
nature of its relationship with appraisers and the true nature
of the appraisal agreements, and (iv) demanded reimbursement for
the cost to procure the extension of credit when the costs are
related to improper appraisal services. Pursuant to California
Business & Professions Code § 17203, which authorizes a trial
court to create a remedy to prevent unfair trade practices, the
plaintiff requests an order enjoining such future conduct on the
part of the defendant, and the appointment of a receiver to
restore any money paid for the provision of the appraisal
services. (See Am. Compl. ¶ 92, 93.)

OTS has opined that California's UCL could be viewed as a
form of contract and commercial law under § 560.2(c), but has
stated that it is preempted in circumstances that would set very
particular requirements on the Associations' lending operations.
See OTS Letter P-99-3 (Mar. 10, 1999) (Def.'s Ex. 2). In
particular, the OTS found that the California statute was
preempted to the extent it sought to regulate advertising,
forced placement of hazard insurance, and the charging of loan-
related fees. See id. Moreover, in Silvas, the Court of
Appeals for the Ninth Circuit found that the California Business

& Professions Code §§ 17200 and 17500 were preempted as applied to claims that sought to regulate the disclosure and amount of lock-in fees. 514 F.3d at 1006-07.

In this case, the plaintiff attempts to apply the California UCL to impose requirements in areas explicitly preempted by federal law. The appraisal practices challenged by the plaintiff appear to relate directly to the processing or origination of mortgages, and thus the application of the law that the plaintiff seeks to impose falls within 12 C.F.R. § 560.2(b)(10). Moreover, the practices the plaintiff challenges also relate directly to the appraisal fee that is charged in connection with the mortgage, and thus the law the plaintiff seeks to invoke regulates loan-related fees under 12 C.F.R. § 560.2(b)(5). Similarly, the plaintiff challenges the disclosure made to her and thus seeks to use the California statute to regulate the disclosures made in connection with the mortgage, which falls within the scope of 12 C.F.R. § 560.2(b)(9). Therefore, as applied to the plaintiff's allegations, the California UCL is preempted under 12 C.F.R. § 560.2(b). See Silvas, 514 F.3d at 1006 (finding claims under the California UCL relating to allegedly faulty disclosure and an allegedly improper lock-up fee preempted under 12 C.F.R. § 560.2(b)(9) and (b)(5)); Ocwen, 491 F.3d at 646 (finding that some allegations under the California UCL would be preempted while others would

not be); but cf. Gibson v. World Sav. & Loan Ass'n, 103 Cal.
App. 4th 1291 (2002) (finding claim that federally chartered
savings association charged excessive amounts and misrepresented
the premiums charged in violation of the California UCL was not
preempted by the HOLA).

Because the plaintiff's claim under the California UCL is
preempted under 12 C.F.R. § 560.2(b), there is no need to
analyze whether it "more than incidentally affects" lending
under 12 C.F.R. § 560.2(c).  If the Court were to reach that
question, the Court would find that as applied to this case, the
California statute would fall within that prohibition also.  The
practices the plaintiff seeks to regulate relate directly to the
valuation of the collateral security for loans.  The relief the
plaintiff seeks would plainly set particular requirements on
IndyMac's lending operations.

**2.**

Similarly, the plaintiff's claim under New York General
Business Law § 349 is preempted.  Section 349(a) provides:
"Deceptive acts or practices in the conduct of any business,
trade or commerce or in the furnishing of any service in this
state are hereby declared unlawful."  N.Y. Gen. Bus. Law §
349(a).  The plaintiff asserts that the defendant engaged in
deceptive acts and practices in its conduct of business and

furnishing of services in the state of New York in violation of
New York General Business Law § 349(a).

The plaintiff realleges all of the prior allegations in the
Amended Complaint and alleges that they violate the New York
General Business Law § 349(a).  The same analysis with respect
to the California UCL applies to the plaintiff's efforts to use
the New York statute to penalize the alleged failure to disclose
appraisal practices and the substance of those practices.  As
applied to the allegations in this case, the plaintiff is
relying on a state law to regulate a loan-related fee,
disclosure of information relating to the fee, and the
processing and origination of a mortgage which are preempted
under 12 C.F.R. § 560.2(b)(5), (9) and (10).

Because the statute is preempted as applied under 12 C.F.R.
§ 560.2(b), it is unnecessary to analyze the application of the
statute under 12 C.F.R. § 560.2(c).  However, for the reasons
explained above with respect to the California UCL, this Court
would also find that the New York statute as applied in this
case more than incidentally affects federal thrift lending
operations.

The plaintiff's claim is distinguishable from Binetti v.
Washington Mutual Bank, 446 F. Supp. 2d 217 (S.D.N.Y. 2006),
where Judge McMahon found that the plaintiff's claims arose
strictly out of the lender's failure to adhere to the terms of

its contract with the plaintiff.  In that context, the statute was not directly aimed at lenders and had only an incidental impact on lending relationships.  Id. at 220.  Here, in contrast, the plaintiff's claims arise out of conduct directly regulated by the OTS:  the processing and origination of mortgages, a loan-related fee, and the accompanying disclosure. See 12 C.F.R. § 560.2(b)(5), (9) and (10).  The appraisals are a prerequisite to the lending process, and are inextricably bound to it.  Because the plaintiff's claim is not a simple breach of contract claim, but asks the Court to "set substantive standards for the Associations' lending operations and practices," it is preempted.  See OTS Letter P-99-3 (Mar. 10, 1999) (Def.'s Ex. 2).  Moreover, unlike the breach of contract claim in Binetti, the verified complaint in this case is aimed at the appraisal and evaluation practices of the defendants.  (Am. Compl. ¶ 13.) The claim also seeks an application of state law that would more than incidentally affect federal thrift lending practices.

**3.**

The contract claim alleges that the plaintiff entered into a contract with the defendant for the purchase of mortgage services, including appraisal services, and that the defendant breached the contract by providing appraisal services which were materially inaccurate, because the defendant allowed interested parties to influence the appraisal and valuation results.  (Am.

Compl. ¶ 64.) According to the plaintiff, the contract claims
are predicated on the duties that the defendant assumed in
contract, including the duty to comply with the covenant of good
faith and fair dealing, and fall within the exception in
paragraph (c)(1) of 12 C.F.R. § 560.2, and are thus not
preempted.[9]

   The plaintiff has cited no provision of any contract
between IndyMac and the plaintiff that IndyMac allegedly
violated. The plaintiff does not dispute that the appraisal
services were provided by a third party, Supreme Appraisals.
(Def.'s Ex. D.) Indeed, the plaintiff does not dispute that she
paid an appraisal fee and that she received an appraisal from
Supreme Appraisals. Rather, the gist of the plaintiff's breach
of contract claim, like her claims under the California and New
York deceptive practices statutes, is that the appraisal
provided to the plaintiff was inaccurate and the plaintiff
alleges in her Memorandum that this was a breach of the covenant
of good faith and fair dealing (Pl.'s Mem. 21.), although that

_____

   [9] The Home Equity Line of Credit that the plaintiff entered into with
IndyMac provides that New York, the state where the mortgaged property is
located, would govern a claim: "Federal law applies to certain aspects of
this Agreement, including, but not limited to, the interest rate and related
charges. The law of the state where you and the property are located will
apply to the extent legally required." (Def.'s Ex. A ¶ 18.)
   The parties have only briefed New York law with respect to the claims
for breach of contract and unjust enrichment, and the Court can accept the
parties' agreement that New York law applies. See, e.g., Burt Rigid Box,
Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

covenant is not mentioned in the Amended Complaint. (Am. Compl. ¶¶ 64-65.)

This claim, like the claims under the California and New York deceptive practices statutes, is preempted because it relies on state law purporting to impose a requirement on the processing and origination of the mortgage, which is preempted under 12 C.F.R. § 560.2(b)(10).[10] See Rosenberg, 849 A.2d at 572 (state contract claim was preempted under 12 C.F.R. § 560.2(b)(9) because the plaintiffs sought to insert a form of state regulation by compelling a different type of billing statement disclosure).

Because the state law breach of contract claim in this case is foreclosed by 12 C.F.R. § 560.2(b)(10), it is unnecessary to determine whether enforcement of the contract claim would "only incidentally affect the lending operations of Federal savings associations," under 12 C.F.R. § 560.2(c). However, for the reasons explained above, the regulation that the plaintiff seeks would in fact more than incidentally affect the lending operations of IndyMac and similarly situated federally chartered savings banks. The contract claim is simply another means to attempt to regulate the method used by IndyMac to assess the value of collateral in securing its loans. Granting the

---

[10] 12 C.F.R. § 560.2(a) defines state law broadly: "For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision."

plaintiff the relief she seeks would have the same effect as a
direct regulation of appraisal practices -- causing IndyMac to
alter the methods it uses to evaluate loans and more than
incidentally affecting lending operations of federally chartered
savings associations.

## 4.

Finally, the plaintiff's unjust enrichment claim fails to
state a claim because it is a quasi contractual claim and the
relationship between the plaintiff and IndyMac is regulated by
contract.  See Payday Advance Plus, Inc. v. Findwhat.com, Inc.,
478 F. Supp. 2d 496, 504-05 (S.D.N.Y. 2007); Mina Inv. Holdings
Ltd. v. Lefkowitz, 16 F. Supp. 2d 355, 361 (S.D.N.Y. 1998);
Graystone Materials, Inc. v. Pyramid Champlain Co., 604 N.Y.S.2d
295, 296 (App. Div. 1993).  While there may be a dispute as to
the scope of the contract, there is no dispute as to the
existence of the contract between the plaintiff and IndyMac.  To
the extent that a valid claim for unjust enrichment exists, it
is preempted for the reasons stated above with respect to the
contract claim.

## Conclusion

The Court has considered all of the arguments raised by the
parties.  To the extent not specifically addressed above, the
arguments are moot or without merit.  For the reasons explained
above, the motion by defendant Federal Deposit Insurance

Corporation, as Receiver for IndyMac Bank, F.S.B., to dismiss the Amended Complaint (Docket No. 32) is **granted**. This case remains stayed as to defendant IndyMac Bancorp, Inc., pursuant to the automatic bankruptcy stay. See supra note 1.

SO ORDERED.

Dated:    New York, New York
            August 25, 2008

John G. Koeltl
United States District Judge